## RAILROAD COMMISSION OF TEXAS et al. v. TYLER TEXAS OIL & RE-FINING CO.

### No. 8301.

Court of Civil Appeals of Texas. Austin.

Feb. 16, 1935.

Wm. McCraw, Atty. Gen., and T. F. Morrow, Archie Gray, L. H. Engelking, Harry S. Pollard, and Wm. J. Holt, Asst. Attys. Gen., for appellants.

Upchurch & Hooper and Willis E. Gresham, all of Austin, for appellee.

McCLENDON, Chief Justice.

This case is companion to a number of others this day decided, involving the December 5, 1934, order of the Railroad Commission, promulgated under Acts 1934, 43d Leg. 2d Called Sess., p. 104, c. 45 (herein designated H. B. 99 [Vernon's Ann. Civ. St. art. 6049c, § 5]); and the opinions in the other cases are referred to in connection with this opinion. See Railroad Commission of Texas v. Phoenix Refining Co. (Tex. Civ. App.) 80 S.W.(2d) 510.

The instant appeal is from a temporary injunction, passed after notice and hearing, restraining at the instance of appellee, Tyler Texas Oil & Refining Company, the Railroad Commission, its members, and E. N. Stanley, its chief enforcing officer and deputy supervisor in the East Texas oil fields, from enforc-

ing, as to 31,966.50 barrels of fuel oil and 109,531 barrels of gasoline, products of crude petroleum oil, the provisions of the Commission's order of December 5, 1934, promulgated under the Act of March 9, 1934 (H. B. 99 [Vernon's Ann. Civ. St. art. 6049c, § 5]).

The petition alleged that: Appellee "has heretofore been engaged in the business of refining and processing crude oil and the products thereof in its refinery in Tyler, Smith County, Texas"; it owned the named products, which "are now in storage and were prior to December 10, 1934, in storage in the tanks of the Tyler Texas Oil & Refining Company at Tyler, in Smith County, Texas"; it "manufactured said products and refined the same from crude oil and products of crude oil purchased and received by it from various and sundry persons in good faith and not in violation of or in evasion of the" December 5, 1934, order of the Commission; "the major portion of said 109,531 barrels of gasoline now in storage at plaintiff's refinery in Tyler, Smith County, Texas, has been sold with the express condition that this plaintiff will be able to transport the same to the various consignees at destination;" it has complied with the provisions of the Commission's order with reference to inventory and tender; but the Commission had arbitrarily refused to approve the tender designated as SW—4 tender, serial No. 117—4. Other allegations of the petition are unimportant, as we view the issues presented.

As to the 31,966.50 barrels of fuel oil, appellee introduced an inventory, dated December 20, 1934, verified by Robert Hall, covering "charging stock 217,951.40 bbls. Gas and Fuel Oil 31,966.54 bbls.," stating that they were "owned by McMurrey Refining Company, as of December 10th, 1934," and that the "above is stored in tanks at McMurrey Refinery, Arp, Texas." The inventory is signed: McMurrey Refining Company, by Robert Hall. Neither the latter's connection with the refinery, nor his authority to make the affidavit, is shown. The application for tender (form SW—4) was made by Hercules Oil Company as shipper, "Transporter Cotton Belt at Tyler, Texas (Receiving Point)." The products tendered were described as "*431,900.-00* Barrels of *Products.*" Other pertinent portions of the tender read: "The above mentioned product is now or will be in tanks at *Tyler Texas Oil & Refining Company* Town *Tyler* County *Smith*, Texas, owned by ————. Said product was or will be produced from *Gas on hand prior to December 10th, 1934,*

received by authority of approved or registered tenders: *No tender required prior to December 10, 1934.* Said tender or tenders being on record with the Railroad Commission." It was signed, "Hercules Oil Co. (Shipper), by R. F. Granland," and verified December 20, 1934, by Granland, who "on oath states that he is the duly authorized agent of above mentioned shipper." It was indorsed "rejected" by Stanley, and bears the serial No. 116—4.

As regards the 109,531 barrels of gasoline, appellee introduced a verified inventory and tender, each dated December 20, 1934, and signed, "George C. Peterson Company By R. F. Granland." The Peterson Company is named as owner "as of December 10, 1934," in the inventory, and as shipper in the tender. The description and location of the products correspond with allegations of the petition, and the other pertinent blanks in the tender are filled in the same language as in the Hercules tender above. It is indorsed "rejected" by Stanley and bears serial No. 117—4.

The testimony at the trial is quite involved and in large measure difficult to follow. This in some measure is probably due to conflicting views of the proper application of the legal principles involved or invoked on the part, respectively, of the opposing counsel and the trial judge. While (probably due to this fact) the case appears not to have been fully developed regarding the source of the crude from which the products were processed by appellee, the record strongly points to inability to trace these products, through records of the Commission supplemented by records which appellee was required by statute to keep, into legally produced oil or products which had been purchased in the processed state by appellee. For our present purposes, we deem it unimportant to consider this phase of the controversy.

In 1931 the Legislature enacted a comprehensive oil and gas conservation law (Acts 1931, 42d Leg. 1st Called Sess., p. 46, c. 26 [Vernon's Ann. Civ. St. arts. 6014, 6008, 6036, 6049c, §§ 4–14, 16–21, 6029, 6032]). This law has been amended in some respects by the following: Acts 1932, 42d Leg. 4th Called Sess., p. 3, c. 2; H. B. 99, which became effective March 9, 1934 (Acts 43d Leg. 2d Called Sess., c. 45 [Vernon's Ann. Civ. St. art. 6049c, § 5]); and Acts 1934, 43d Leg. 3d Called Sess., c. 64, p. 120 (herein referred to as S. B. 21 [Vernon's Ann. Civ. St. art. 6049c, § 14, art. 6036 and note]), which became effective December 26, 1934, and which is not involved in this litigation.

Section 14 of the 1931 Act (1st Called Sess.) c. 26 reads: "The purchase, transportation or handling of crude petroleum oil or natural gas produced from any property in excess of the amount allowed by any statute or any rule, regulation or order of the Commission is hereby prohibited, and the Commission shall have power to enjoin any violation of this section."

By section 5 of the act the Commission was given power and charged with the duty "from time to time, to inquire into the production, storage or transportation of crude petroleum oil and of natural gas, in order to determine whether or not waste, as hereinbefore defined, exists." The Commission was also given the power to require the filing of sworn statements and reports pertaining to "the production, storage or transportation of crude petroleum oil or of natural gas."

H. B. 99, which was upheld by this court in Culver v. Smith, 74 S.W.(2d) 754 (error refused), made it the duty of all parties "purchasing, storing, or transporting crued petroleum oil or natural gas within this state to make and keep in this state a permanent record, or copies of records of the quantity or amount of such oil or gas so purchased, stored or transported within this state;" and also gave the Commission and the Attorney General the power to examine such records (section 6 [Vernon's Ann. Civ. St. art. 6049c, § 6]).

By section 5, to quote from the Blue Diamond Case (State v. Blue Diamond Oil Corp.), 76 S.W.(2d) 852, at page 856 (Tex. Civ. App.): "The commission is given power 'to inquire into the * * * transportation, * * * marketing * * * of crude oil.' It is made the duty of those '* * * refining, * * * treating, marketing, or processing * * * crude oil' to keep various records regarding the product, including the amount 'transported, refined, * * * treated, marketed, or processed,' the source from which is obtained the crude oil from which such products are produced, and 'the disposition made of same.' The commission is given power to require 'sworn statements or reports' covering various enumerated matters 'including those facts enumerated herein.' The commission is also given power to examine the books, records, and plants of the refiners and processors 'for the purpose of ascertaining the facts concerning the matters and things hereinabove set forth.' This language, to our mind, amply

confers the power claimed and sought to be exercised by the commission in this regard."

It will thus be observed that H. B. 99 is the first act which in terms purported to deal with the products of crude oil; the previous acts in express terms dealing only with crude oil in its natural state. H. B. 99 did not in express terms make it unlawful to transport or otherwise deal in the products of illegally produced crude oil. But it did require, as above shown, of those "refining, * * *, treating, marketing, or processing of crude oil" to keep records regarding the product, including the amount transported, refined, treated, marketed, or processed; the source from which it obtained the crude oil from which such products were produced; and the disposition made of same. In other words, this bill extended the police power of the state and the powers and duties of the Commission over the products of crude oil so long as such products remained in the hands of the original transformer thereof from the crude into products; and the records required to be kept included the disposition made of such products. At this point the police power exercised and the jurisdiction of the Commission ended, so far as the express provisions of the act are concerned. In the Blue Diamond Case we held that H. B. 99 accorded ample authority in the Commission to require of those coming within the purview of H. B. 99 to obtain a permit or approved tender, supported by data required by the act, as a prerequisite to shipment of crude oil products.

The December 5, 1934, order of the Commission by its express terms is limited to "products transported from each and every oil field situated in the State of Texas," and "to products transported from each and every refinery, topping plant, blending plant, gasoline plant, or other plant at which a product is manufactured or processed in said state." For convenience we will refer to all of these plants as refineries.

It may be conceded that this provision is in some respects broader than the express provisions of H. B. 99, in that it covers products held in the oil field by one who had acquired them in good faith after their transformation from the crude oil state, and to refineries that process no crude but only the products of crude. As an enforcement measure, we think there can be no question as to the validity of the order in this regard, since to exempt entirely from the provisions of the order products in the oil fields or in refineries, after passing from the hands of the original processor, would present a fruitful source of evasion of the conservation laws which it was the primary objective of the act to prevent. In this regard the order bears a reasonable relation to the supporting act and its objectives.

The order in every respect fully protects those bona fide acquiring products of crude oil, whether they be processors, dealers, or other owners.

Section IV of the order required inventories to be filed with the Commission between December 10 and December 20, 1934, covering products on hand on December 10, 1934. These inventories were not required to contain anything with reference to the source of the products or the oil from which the inventoried products were produced, but merely required a statement of the ownership, quantity, and description of the products, and where located.

It is true that section V of the order denies a permit where "a product is processed from a product of oil produced, transported, handled, or acquired in violation of the laws of Texas or the Commission's regulations adopted pursuant thereto." Even if this language, standing alone, might be interpreted to apply to any products of illegally produced oil, regardless of when, by whom, or under what circumstances the product had been acquired (which we do not think is its correct interpretation), it should be read in connection with the other provisions of the order. Subdivision f of section I, which requires in the tender application (form SW—4) "a statement of the crude oil, or the crude oil product from which the tendered product or products were or will be manufactured," specifically provides that this showing "may also be made by showing that the person tendering had on hand upon the effective date of this order, and has not (or at time of manufacture of the product or products, if already made, had not) otherwise used or disposed thereof, crude oil or products thereof sufficient in quantity to cover the manufacture of the tendered product or products, provided the existence of such crude oil or product is shown at the effective date of this order by sworn inventory hereinafter referred to." Subdivision g of section I provides: "If the product or products being tendered had been produced and were in storage on the effective date of this order, it shall be necessary to show the existence of such tendered product or products at the effective date of this order by the sworn inventory hereinafter referred to."

It seems quite manifest that in so far as products on hand on December 10, 1934, were

concerned all that was required of the tenderer was the sworn application for tender on the regular form of the Commission (SW—4), supported by the inventory filed with the Commission not later than December 20, 1934. Compliance with the order in these respects gave the right to demand approval of the tender, unless the product tendered was at the time of the inventory in the hands of the original processor, and was produced from illegal oil (a subject discussed below); or unless there was collusion between such original processor and the one filing the inventory; or unless the transaction constituted a mere subterfuge or evasion of or fraud practiced upon or circumvention of the conservation laws. In either of which events we think the Commission has the clear power and duty to refuse the tender.

The above holding, that products in the hands of the original processor from the crude cannot legally be transported, is not essential to a decision of this or any of the other cases now before us in the present state of the records. The order can be upheld regardless of the right of the processor to ship a product which he has processed from illegal, and therefore contraband, crude, under our holding in the Blue Diamond Case that the Commission has the power to require furnishing of data provided for in H. B. 99 as a prerequisite to approval of shipping tenders. The question, however, is incidentally involved, and may arise upon a trial upon the merits. For that reason we will briefly state our views thereon.

The Act of 1931, § 14, above quoted, prohibited the transportation of excess crude oil. We interpret this act to apply to the products of excess crude in the hands of the original processor. Any other interpretation would allow the holder of such crude, shipping of which the law prohibits, legally to ship such illegal commodity by merely changing its form. Such construction would authorize a palpable subterfuge, evasion, and circumvention of the statute; and we are unable to conclude that its framers so intended.

The record shows that under forms for reports and tenders required by the Commission by orders passed under the 1931 act and amendments thereto prior to H. B. 99, legal oil could be traced, through serial numbers, from the producing well into the hands of any one, so long as it remained in Texas in its natural state. Under records required by H. B. 99 it could be further traced into products into and out of the hands of the original processor.

The December 5th order was the first valid order of the Commission passed under H. B. 99; previous orders having been declared invalid in the Blue Diamond Case. It required shipping tenders for all products on hand on December 10, 1934 (effective date of the order), and those subsequently acquired or produced. As to products on hand December 10th, it required verified inventory, as of that date, to be filed not later than December 20th. The data required in the inventory was: (1) Ownership; (2) classification (that is, the particular kind of product); (3) quantity of each kind of product; (4) where stored; (5) in what receptacles; (6) ownership of receptacles. The evident purpose of the inventory was to furnish the Commission with data concerning all products on hand on December 10, 1934, in the oil fields and refineries of Texas; from which data the Commission might ascertain the existence of such products, and might trace, through records of the Commission and those required of the owners by H. B. 99 and other statutes, the origin of the crude that went into the products. We do not construe the order as requiring any data regarding the source of the products or the oil from which they were processed; but only the above data from which the Commission could make its own checking and tracing as to source. But even if the inventory and tender requirements taken together be construed as requiring source data, they cannot fairly be construed as requiring more than the source of acquisition by the December 10th owner—data which his records should contain if he had complied with H. B. 99 and previous acts.

The order, so construed, is not in any particular retroactive. It made nothing illegal or contraband, which was not such before its passage. Its requirements were all prospective, in that the things required were to be done in the future, could readily be done by the December 10th owners, were reasonable in themselves, and had a reasonable relation to and were designed to effectuate the objectives of H. B. 99.

As we interpret the testimony of Captain Stanley, all inventories filed by December 20th were checked with records of the Commission and of the owners; and in every case where such checking disclosed legal oil to support the inventory the tender was approved. Where, however, the tender could not be so supported, it was rejected. We think there can be no serious question but that products acquired in the processed state in good faith were not made contraband by H. B. 99, or any

prior act; and where the Commission refused its approval of tenders by such owners, it exceeded its authority regardless of the source of the crude from which the products were processed.

Applying these conclusions to the case at bar, appellee has not shown itself entitled to the tenders in either instance. It alone is seeking relief as owner, both at the time its petition was filed and on December 10th. No inventory was filed by it, but it relies upon inventories by others under oath asserting their ownership. Additionally, as to the "31,-966.54 barrels of fuel oil" named in the petition, the tender asks authority to ship "*431,-900.00* barrels of *Products*," without other description, which it states were then or would be in appellee's tanks at Tyler, whereas the supporting inventory lists "charging stock 217,951.40 bbls. Gas and Fuel Oil 31,966.54 bbls.," stored in tanks at McMurrey Refinery, Arp, Tex.

Predicated alone upon noncompliance with the order as above interpreted, and regardless of the showing relative to appellee's dealing, vel non, in illegal oil, the tenders were properly rejected.

The order appealed from is set aside, the temporary injunction of the trial court is dissolved, and the cause remanded to that court.

Temporary injunction dissolved; cause remanded.