## RAILROAD COMMISSION OF TEXAS et al.
### v. ARCHER.
#### No. 8298.

Court of Civil Appeals of Texas. Austin.

Feb. 16, 1935.

Wm. McCraw, Atty. Gen., and T. F. Morrow, Archie Gray, L. H. Engelking, Harry S. Pollard, and W. J. Holt, Asst. Attys. Gen., for appellants.

Upchurch & Hooper and Willis E. Gresham, all of Austin, for appellee.

BAUGH, Justice.

Appeal is from a temporary injunction granted by the trial court restraining the Railroad Commission and others from interfering with the sale and movement by him of certain by-products of crude oil alleged to have been purchased by him prior to, and to have been in his possession in Gregg county, Tex., on December 10, 1934. The grounds for such injunction alleged were that he had filed with the Commission the inventory required by the Commission's order of December 5, 1934, effective December 10, 1934, showing the amount and character of said products and where located, and had duly applied for a tender to ship same, but that the Commission had arbitrarily and unlawfully refused to grant him such permit on the ground that he had not shown that said by-products had been derived from oil legally produced under the conservation laws and the orders of the Commission.

The action of the Commission was predicated upon its order of December 5, 1934. As we interpret that order, and the statutes (articles 6104, R. S., and art. 6029, as variously amended [Vernon's Ann. Civ. St. art. 6029]) under which it was issued, no law was then in force prohibiting as unlawful the sale or transportation of the by-products of crude oil or natural gas owned by, and in the possession of, such purchasers thereof on December 10, 1934. Prior to the effective date of Senate Bill 21, Acts 43d Leg., 3d Called Sess., c. 64, p. 120 (Vernon's Ann. Civ. St. art. 6049c, § 14; art. 6036 and note), it appears to have been the purpose of the Legislature, and of the Commission, to confine the regulation of oil and/or natural gas production to the producers or dealers in such products in their original or natural state and to the first or initial refiners of such natural products. The records and reports required up to the effective date, December 25, 1934, of said Senate Bill No. 21, appear to be directed only towards the discovery and prevention of illegal or excess oil in those two sources. If the flow of excess or illegal oil could have been effectively checked at these sources, it is obvious that by-products from illegal oil would not have entered the channels of trade and no occasion would have arisen for declaring such by-products contraband, and no necessity would have existed for the regulation of their sale, storage, transportation, rerefining, etc. It was not incumbent, therefore, upon those dealing only in by-products of crude oil prior to December 10, 1934, to ascertain as a prerequisite to their right to deal in same, whether the products they purchased were derived from legal oil. The producers and first refiners of crude oil were, as we interpret the conservation acts, inhibited from selling by-products derived from illegal crude oil in the first instance, and if the enforcement agencies of the state failed to impound such products in their hands, movement of such products could not, after they had passed into the possession of subsequent owners, be thereafter prevented by the Commission.

No legislative act, prior to Senate Bill No. 21, extended to subsequent purchasers of by-products. And not having been required, prior to December 10, 1934, to ascertain that such by-products were derived from oil legally produced, said order of December 5, 1934, cannot and does not deny to such persons the right, without first making such showing, to dispose of such by-products in their possession on and prior to said December 10, 1934. The terms and requirements, and the applicability of said Commission order of December 5, 1934, is fully discussed in Railroad Commission v. Burnham (Tex. Civ. App.) 80 S.W.(2d) 496, and Railroad Commission v. Tyler Texas Oil & Refining Company (Tex. Civ. App.) 80 S.W.(2d) 500, this day decided, and will not be further reiterated here.

In the instant case the proof as to the character and quantity of the by-products involved was not without doubt. Appellee's witness testified that he prepared the inventory filed from data furnished him by the agent of appellee, and that same was verified by said agent, not by the witness. That he, the witness, could not identify the by-products involved, from his own knowledge or inspection, either as to quantity or character. Neither the appellee nor the agent who verified said inventory testified. When this case was first filed in the 126th district court of Travis county, that court issued on January 7, 1935, a temporary restraining order against appellants. Pursuant to motion of appellants this order was by said court dissolved on January 9, 1935, and the cause transferred to the 53d district court of Travis county. On the trial hereof in the latter court, affidavit of one Nola B. Randolph was introduced, showing that she was the manager of the Archer Marketing Company; that while said restraining order was in force said company shipped a part of the products described in the original petition, showing the remainder on hand on January 16, 1935. While the affidavit indicates that the affiant was jointly associated with Archer in said Marketing Company, the sworn petition alleged that C. D. Archer owned said products, and that he acquired same operating in the name of the Archer Marketing Company. The affidavit of Nola B. Randolph also showed that these products were acquired from several named parties and refineries, including the Blue Diamond Oil Corporation. There was evidence to show that Archer also owned the Blue Diamond Oil Corporation, which was a refinery of crude oil. Evidence in the record, though admitted only for purposes of a bill of exception, indicated that a by-pass had been discovered about January 1, 1935, with evidence that it had been laid for a considerable time, running from one of Shell Petroleum Company's wells into the Blue Diamond refinery. That is, there was evidence tending to show that illegal oil was, prior to December 10, 1934, being run into said refinery owned by Archer, who likewise owned and operated the Marketing Company. There was no showing as to what portion of the by-products here involved was obtained by Archer, operating as a marketing company, from the corporation owned by him. By-products in the possession of the refinery, which refined them from crude oil illegally obtained by it, would not in its hands be entitled to a tender from the Railroad Commission. Such by-products in its hands would be contraband under the laws and rules of the Commission in force prior to the December 5th order. If the corporation were owned by Archer, as the evidence indicates, and was refining illegal crude oil, he could not by transferring by-products so illegally produced from the corporation owned by him to himself in the capacity of a marketing agency, thus circumvent the law and the rules of the Commission, and by so doing make such by-products tenderable, which, absent such subterfuge or evasion, would not have been tenderable.

Having invoked the equitable powers of the court, it was his duty to enter with clean hands. The record presented raises serious doubts as to that on such portion of said by-products as may have been obtained from the Blue Diamond Oil Corporation, and since there was no proof on that, we think the trial court improperly issued said temporary injunction covering all of said by-products involved.

The injunction granted by the trial court, and that heretofore granted by this court, are therefore dissolved, and the cause reversed and remanded.

Injunctions dissolved; cause reversed and remanded.